# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF GEORGIA

# STATESBORO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No. CR604-27 |
| | ) | |
| GARY ALEXANDER MATTHEWS, | ) | |
| Defendant. | ) | |

## **REPORT AND RECOMMENDATION**

Defendant has filed a motion to suppress. Doc. 8. The Court held an evidentiary hearing on April 4, 2005, at which time the government offered the testimony of Agent Robert Shore, Deputy Commander of the East Central Georgia Drug Task Force, and Deputy Sheriff Brad Hart, formerly assigned to the East Central Georgia Drug Task Force. Defendant offered the testimony of Daniel Roundtree and Joseph Durden. For the reasons that follow, the Court finds that defendant's motion is without merit and should be DENIED.

## I. BACKGROUND

In January 2004, former Agent Brad Hart was investigating defendant for drug trafficking. In the course of his investigation, he encountered a confidential informant who claimed that he could purchase cocaine and marijuana from defendant. At that time, defendant was known to Hart only by his nickname, "Mad Dog." On January 28, 2004, a controlled purchase was arranged and executed. During the transaction, Hart did not see defendant specifically but witnessed the informant enter a dark gray late 90's model Cadillac to make the purchase. It was Hart's belief that this Cadillac belonged to Mad Dog. According to the confidential informant, Mad Dog kept a gun either on his person or nearby at all times.

About one week later, on the evening of February 4, 2004, Hart, Agent Shore, and one other officer were patrolling known drug trafficking areas in Vidalia. The officers observed a car stopped in the road. A black male was standing with his arms reaching through the car window into the passenger compartment. Believing that a drug transaction may be occurring, the officers parked and exited their vehicle to attempt to speak to the individuals in the car and the man standing outside, whom the

officers identified as Joseph Durden. When Durden saw the officers, he immediately started running. The officers gave chase, but Durden was able to get away.

After he fled, Durden arrived at the nearby home of Daniel Roundtree. Durden ran into the yard, explaining to Roundtree that police officers were following him. At Roundtree's house, Durden telephoned defendant to come and pick him up. About twenty to thirty minutes later, the officers, still patrolling, passed by Roundtree's house. They observed a dark gray Cadillac stop in the road and saw someone enter the vehicle. As the Cadillac drove away, the officers followed the car for four to five minutes until the car entered the drive-thru lane at a McDonald's restaurant. Though the officers were driving an unmarked white Ford Expedition, defendant and Joseph Durden were aware that they were being followed by drug enforcement agents. Not only had Durden seen the same vehicle earlier, but that specific Expedition was known to some in the community, including Durden and Roundtree, as having been confiscated by the task force from a local drug dealer.

The officers pulled directly behind defendant's car in the drive-thru lane. Hart then exited his vehicle and approached the driver's side of defendant's car. As he approached, he noticed that Joseph Durden was sitting in the back seat of the car.[1] At that time, Hart motioned the other officers to exit the vehicle and continued forward to speak to the driver.

The only testimony received regarding the ensuing exchange between defendant and Hart comes from Hart himself. According to Hart, he initially engaged defendant in general conversation, asking how he was doing. Though Hart was not wearing a police uniform, both his badge and his sidearm were visible on his belt. Hart noted defendant's failure to wear his seat belt and asked defendant for his name.[2] Defendant responded that

---

[1] Though the officers had not been able to identify the individual entering into the rear of the dark gray Cadillac, they had suspected that it was Durden. Their suspicion was based on a tip from a confidential informant that Durden and the individual then known only as Mad Dog were associates.

[2] There is some variance between Shore's and Hart's testimony regarding defendant's use of his seatbelt. Hart testified that he noticed that defendant was not wearing his seatbelt when he and the other officers first passed by the car. He further testified that when he approached the vehicle in the drive-thru, he intended to address defendant's failure to wear a seat belt but had no intention of issuing a citation or even a warning for that failure. Shore, on the other hand, testified that he could not discern whether any of the passengers of the car were wearing seat belts when he first encountered the car or at any later time. While it is not clear whether defendant was wearing his seatbelt before Hart encountered him in the drive-thru, the Court credits Hart's testimony that when he approached the car, defendant was not wearing his seatbelt.

his name was Deon Waller. Hart then asked for defendant's driver's license, but defendant responded that he did not have any identification with him.

Hart testified that defendant then began to try to put on his seatbelt. Believing that defendant may be armed, and out of concern for his own safety, Hart directed defendant to stop reaching for his seatbelt and to place his hands on the dashboard. Defendant initially complied but then began to move his hands again, reaching down toward his waist. Hart again directed defendant to keep his hands where Hart could see them and specifically told him to place his hands outside the car window. Again, defendant began to move his hands back inside the car. At that time, Hart asked defendant to step out of the car. Based on defendant's demonstrated intent to move his hands where Hart could not see them, and based on reliable information that the driver of the dark gray Cadillac was a drug dealer and kept a firearm on his person or nearby at all times, Hart suspected that defendant might have drugs or a gun on his person. Hart intended to conduct a pat down search of defendant and instructed him to place his hands on top of the car.

At the time that this was happening, Durden had exited the vehicle at the request of the other officers. He was placed in handcuffs, and the officers conducted a pat down search of his person incident to arrest. The officers discovered a bag of marijuana. At the same time, one of the officers observed the third passenger of the vehicle, a female named Vindia Raiford, attempt to conceal what appeared to be drugs in the center console of the front seat.

At that time, Hart attempted to put defendant in handcuffs for his suspected involvement with drugs. Defendant resisted, and several officers had to tackle him to the ground. Defendant continued to resist but was eventually handcuffed and arrested. Once defendant was handcuffed, the officers discovered a fully loaded firearm under his person. A subsequent search of defendant's car revealed marijuana, cocaine, and ammunition.

On February 15, 2005, defendant filed the motion to suppress now before the Court. The government filed its response on March 2, 2005.

## II. ANALYSIS

In his motion, defendant asks the Court to suppress all physical evidence and statements obtained by police as a result of the search of defendant's person and vehicle. In support of this request, defendant argues that his vehicle was stopped improperly because the law enforcement officers had no "reasonable, articulable suspicion that criminal activity [was] afoot" in order to justify a Terry stop. Illinois v. Wardlow, 528 U.S. 119, 123 (2000) (citing Terry v. Ohio, 392 U.S. 1, 30 (1968)). The government counters that the officers did not effect a stop of defendant's vehicle and that Hart's initial approach was nothing more than an unobjectionable police-citizen encounter. According to the government, it was not until reasonable suspicion of criminal activity arose that defendant was "seized" within the meaning of the Fourth Amendment. After hearing the evidence and carefully considering the arguments of the parties, the Court agrees with the government.

"[N]ot every encounter between law enforcement officers and a citizen constitutes a seizure within the meaning of the Fourth Amendment." United States v. Thompson, 712 F.2d 1356, 1359 (11th Cir. 1983) (citing

Dunaway v. New York, 442 U.S. 200, 212 n.12 (1979); Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968). Indeed, an officer's mere approach of a vehicle to question "a willing person in a public place involves no coercion and detention and hence is outside the domain of the Fourth Amendment." Id. (citing Florida v. Royer, 460 U.S. 491 (1983)). A seizure occurs when "in view of all the surrounding circumstances, a reasonable person would believe that he was not free to leave." United States v. De La Rosa, 922 F.2d 675, 678 (11th Cir. 1991) (citing Michigan v. Chesternut, 486 U.S. 567, 573 (1988)).

In order to justify a seizure of an individual, an officer must have a reasonable suspicion that criminal activity is afoot. United States v. Griffith, 109 F.3d 706, 708 (11th Cir. 1997). Reasonable suspicion, like probable cause, is a "fluid concept" which does not submit to easy definition and which is "not readily, or even usefully, reduced to a neat set of legal rules." Ornelas v. United States, 116 S. Ct. 1657, 1661 (1996) (quoting Illinois v. Gates, 462 U.S. 213, 232 (1983)). "Reasonable suspicion requires more than a hunch; it requires that the totality of the circumstances create, at least, some minimal level of objective justification for the belief that the

[suspect] engaged in unlawful conduct." United States v. Blackman, 66 F.3d 1572, 1576 (11th Cir. 1995).

Defendant does not contest that when Hart approached his vehicle, it was stopped at the McDonald's drive-thru. In this circuit, it is clearly established that Hart's mere approach of the vehicle to speak to defendant did not constitute a Fourth Amendment seizure. See United States v. Baker, 290 F.3d 1276 (11th Cir. 2002) (finding that officer's approach of running vehicle stopped in traffic to make inquiries not a seizure under the Fourth Amendment); Thompson, 712 F.2d at 1359. This fact is not changed even when an officer partially blocks the parked car. See United States v. Kim, 25 F. 3d 1426 (9th Cir. 1994) (no seizure where officers approached parked vehicle and "partially blocked" the parked car). Accordingly, no violation of defendant's Fourth Amendment rights occurred by Hart's initial approach of the vehicle.

Hart's first request that defendant keep his hands where Hart could see them did not eliminate the consensual nature of the encounter as the request was "minimally intrusive." United States v. Gutierrez-Vargas, 2005 WL 696902, at *8 (D. Or. Mar. 25, 2005). The Court also finds the

request to be a reasonable one. Based on the information he had received from a reliable confidential information, Hart had reason to believe that defendant might be armed. Further, when defendant failed to comply with his request, Hart was justified in repeating his request.

Once defendant failed to comply a second time and Hart asked defendant to exit the vehicle, the mood of the encounter shifted from a consensual nature to one in which defendant would not "feel free 'to disregard the police and go about his business.'" Florida v. Bostick, 501 U.S. 429, 434 (1991) (quoting California v. Hodari D., 499 U.S. 621, 628 (1991)). Therefore, at that point a seizure occurred and a reasonable suspicion of criminal activity by Hart must be shown to justify it.

The Court finds that once defendant was asked to step out of his vehicle, the totality of the circumstances gave Hart a sufficient basis to make his request. He had reason to believe that defendant was the individual known as Mad Dog to his confidential informant. He had witnessed defendant stop his car in the road to pick up Joseph Durden, who had just fled from officers after having been seen acting suspiciously in a known drug trafficking area. Defendant had admitted to driving without

having his driver's license.  With that admission, Hart was authorized to place defendant under arrest for driving without a license.  See O.C.G.A. §§ 40-5-20 & 40-5-29 (requiring that driver's have license and be able to produce it at officer's request).  And lastly, defendant had twice reached to the area of his waist despite Hart's request that he keep his hands where Hart could see them.  Hart certainly had a sufficient reasonable suspicion of criminal activity to ask defendant to step out of the car without violating his Fourth Amendment rights.

Once defendant was out of the car, Hart was unable to do a pat down search of defendant's person before the officers discovered drugs on Durden's person and noticed Raiburn attempting to conceal drugs inside the car.  Based on these discoveries and defendant's prior reluctance to cooperate with Hart's requests, the officers' attempt to handcuff defendant at that time was reasonable under the circumstances.  See United States v. Askew, 2005 WL 757381, at *9 (7th Cir. Apr. 5, 2005)(recognizing current trend of permitting use of handcuffs in Terry stops and inherent danger posed to officers stopping those suspected of drug trafficking in public areas); Fisher v. Harden, 398 F.3d 837 (6th Cir. 2005) (recognizing that use

of handcuffs may be justified when necessary to ensure safety of officers); United States v. Fisher, 364 F.3d 970, 973 (8th Cir. 2004) ("It is well established, however, that when officers are presented with serious danger in the course of carrying out an investigative detention, they may brandish weapons or even constrain the suspect with handcuffs in order to control the scene and protect their safety."); United States v. Blackman, 66 F.3d 1572, 1576-77 (11th Cir. 1995) (handcuffing of armed robbery suspects was reasonable measure during Terry stop). The Court finds the inherent dangers involved in dealing with those suspected of drug trafficking, especially in public areas, justify placing defendant in handcuffs. Defendant's subsequent resistance justified his arrest.

## III. CONCLUSION

For the foregoing reasons, the Court recommends that defendant's motion to suppress be DENIED.

**SO REPORTED AND RECOMMENDED** this 12th day of April, **2005.**

UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA